Gervis *v.* Kay et al.

520

Argued October 4, 1928. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*Earl F. Reed*, of *Thorp, Bostwick, Stewart & Reed*, with him *Simon Sher*, for plaintiff appellant.—The court below, as we view it, properly charged the jury on the question of damages at the trial: Class & Nachod Brewing Co. v. Giacobello, 277 Pa. 530.

The relationship between a broker and his customer in a margin transaction being that of pledgor and pledgee, is certainly one of trust: Berberich's Est., 264 Pa. 437; Vosburgh's Est., 279 Pa. 329.

In this state, once the conversion is established, the well settled rule in Pennsylvania is applicable; this fact of conversion has been settled by the jury in appellant's favor. Appellees had no authority to sell: Learock v. Paxson, 208 Pa. 602; Sproul v. Sloan, 241 Pa. 284; Sterling's Est., 254 Pa. 155; Berberich's Est., 264 Pa. 437.

*Donald Thompson,* of *Calvert, Thompson & Berger,* for defendants and Alfred G. Kay et al., appellants. —A broker who holds stocks of a customer on margin account is of course a pledgee. When he sells those stocks, however, he may be acting in either one of two capacities. If he makes the sale, either rightfully or wrongfully, because he thinks the customer's margin does not justify him in carrying the account any longer, he manifestly purports to exercise his rights as a pledgee and acts accordingly. If, however, he makes the sale upon the supposed order of his customer, whether correctly understood or not, it is just as clear that he purports to act as his customer's agent, although he may act negligently.

If this appeal involves the law of pledgor and pledgee, attention is called to Granger v. Fidelity Trust Co., 198 Pa. 428.

The only case directly in point which we have been able to find, involving a broker and his customer, is Hanks v. Drake, 49 Barbour (New York) 186.

It seems clear to us that the proper decision of this case turns on the law not of pledges but of principal and agent.

It is a general rule, of constant application in the law of agency, that he who, voluntarily and with knowledge of the facts, accepts the benefit of an act purporting to have been done on his account, by his agent, thereby ratifies it and makes it his own as though he had authorized it in the beginning: Danish Pride Milk P. Co. v. Marcus, 272 Pa. 340; Walker v. Harbison, 283 Pa. 111; Sloan v. Johnson, 20 Pa. Superior Ct. 643.

OPINION BY MR. CHIEF JUSTICE MOSCHZISKER, November 26, 1928:

This is an action to recover damages for an alleged conversion of two hundred shares of the common stock of the Mack Truck Company, pledged by A. A. Gervis, plaintiff, to Kay, Richards & Co., a partnership, defend-

ants, and held by them to secure the unpaid balance of the purchase price advanced to plaintiff, who acquired the stock on margin through defendants' brokerage office. The verdict was against defendants; a new trial was granted, and plaintiff has appealed from that order. Defendants also have appealed, contending that they are entitled to judgment n. o. v. We shall dispose of both appeals in this opinion.

Plaintiff, who carried a considerable number of corporate securities with defendants on margin, purchased, in that way, the stock here in controversy; a few days later he instructed defendants to sell these shares if the price advanced to $142\frac{3}{8}$ or if it declined to $137\frac{3}{4}$; concerning this there was no dispute at the trial. The controversy was as to whether Gervis subsequently cancelled his selling order, thereby depriving defendants of authority to dispose of the stock in question, as they did later, at the price of $142\frac{3}{8}$. Plaintiff contended that he called at the office of defendants and left an order cancelling the whole of his prior direction to sell; on the other hand, defendants contended that only the "stop-loss," or lower price, part of the original order was cancelled, while the original instructions to sell at $142\frac{3}{8}$ were allowed to stand. This issue was submitted to the jury, which found for plaintiff. Accepting the fact, thus established, that defendants by mistake wrongfully sold plaintiff's stock, the question before us on the latter's appeal, which we shall consider first, is, What rule as to the measure of damages controls? for, since the court below certifies that what it conceived to be the trial judge's incorrect charge on this point was the sole reason which moved it to grant a new trial, the appeal from its order to that effect properly presents a reviewable question: Class & Nachod Brewing Co. v. Giacobello, 277 Pa. 530, 537; March v. Phila. & West Chester Trac. Co., 285 Pa. 413, 417.

As just indicated, the judge presiding at the trial had a different theory from that subsequently adopted by the

court below in making the order about to be reviewed; he charged that, should the jury's finding favor plaintiff, the latter would be entitled to recover "the highest market value of the stock from the time of the [wrongful] sale until the date of trial," adding, "There is no doubt that [such] is the rule of law in Pennsylvania......applicable to the measure of damages; there is no other rule,—no middle ground [seems] possible in this case." On consideration of defendants' motion for a new trial, however, the court below reached the conclusion that the above instruction was incorrect; that, since defendants had "acted in the exercise of a supposed authority to sell" (though, according to the verdict, they were mistaken in this), the trial judge should have followed the ordinary rule on the measure of damages, i. e., the market value at the time of sale, with interest to the date of trial, and should have instructed the jury thus to adjust plaintiff's loss. In this connection, it is to be noted that plaintiff purchased the stock in controversy, through defendants, at 139¾, and defendants sold it for him at 142⅜, though without authority. Hence the transaction showed no immediate loss, but a profit of about $500; and, as plaintiff says in his brief, if the market value at the time of the wrongful sale is the criterion to adopt in measuring damages,—the theory on which the court below granted the new trial,—it would be a useless thing to try this case again, for, on that theory, plaintiff's damages would be merely nominal.

In disposing of the motion for a new trial, the opinion of the court below, dealing with the question of the proper rule to be followed in measuring the damages, states conditions of controlling importance, namely, that, on the evidence under review, "there was no conversion of the stock in the ordinary sense that it was misappropriated to defendants' use, either by way of pledge to secure their own debts......or by the application of the proceeds of the sale for their own protection against a falling market"; further, that "this case presents......

an element not found in the decisions relied upon by the plaintiff......[for here] the sale was made by the defendants in a mistaken exercise of their capacity as agents and not in the exercise of their supposed rights as pledgees," adding, "There is thus eliminated from the case the recognized basis upon which the rule [allowing as damages the highest market value prevailing between the date of the conversion and the date of the trial] depends,—a breach of good faith and common honesty or a violation of the trust imposed upon...... pledgees,—and it leaves in the case, as the only basis for recovery, a negligent act, done without wrongful intent ......, occuring through a misunderstanding."

We agree with the court below that the instructions to the jury on the measure of damages did not reach the justice of the situation presented by the evidence; but we are not convinced that the rule suggested by that tribunal, in its opinion granting a new trial, is the proper one to apply to the circumstances of this case. There is another rule, however, between these two, which more justly meets the situation here involved than either of them; and the principle of this other rule, we think, should be applied to the present case. The rule we have in mind, known as the New York Rule, endeavors to do exact justice, as nearly as may be, to both sides; so it ordains that, while the injured party shall recover the full amount of his loss directly consequent upon the wrongful act, yet it is his duty to minimize that loss as much as is reasonably possible. While this rule may have been stated somewhat differently in later New York cases, Baker v. Drake, 53 N. Y. 211, 217, puts it in the form which most strongly appeals to us for application to a case like the one at bar. It is there said: "If, upon becoming informed of the sale, [the purchaser] desired,......he had a right to disaffirm the sale and require defendants to replace the stock; if they failed or refused to do this, his remedy was to do it himself and charge them with the loss reasonably sustained in doing

so; the advance in the market price of the stock from the time of the sale up to a reasonable time to replace it, after plaintiff received notice of the sale, would afford a complete indemnity." This statement of the rule indicates in itself that the reasonable time mentioned comprehends a disaffirmance of the sale by plaintiff and failure or refusal on the part of defendant to replace the stock.

While the rule to which we refer is known as the New York Rule, it is in force in the federal courts (Galigher v. Jones, 129 U. S. 193, 200, 202) and in other jurisdictions, as shown by the notations to Hall v. Paine (224 Mass. 62, 112 N. E. 153), in 1917C L. R. A. 737, note 7, at p. 753. The rule, as we would apply it to a case like the one now before us, may be restated thus: When, in an action of conversion instituted against a broker to recover damages for a wrongful sale of pledged stock, which subsequently rose in market value, it appears that, in making the sale, the broker acted on an honest though mistaken belief that he was carrying out the instruction of his customer, that notice of the sale was given to the owner, who made a reasonably prompt demand on the broker to remedy the wrong, and that the latter failed or refused to comply, the measure of damages is the difference between the sales price and the highest market price of the stock during the interval between the time of its conversion and a time, after defendant's refusal or neglect promptly to replace the shares, when plaintiff had a fair opportunity, under the attending circumstances, to go into the market and acquire a like number of shares of the same stock.

Where plaintiff, on learning of the conversion, goes into the market and makes an actual purchase to replace the stock in controversy, the question of a reasonable time in which to pursue that course is eliminated from the case, so far as the plaintiff is concerned, for he has determined the point himself by the date of his purchase. The customer is not obliged to reacquire

like stock, but he is obliged, as in other cases, to minimize his damages, and if he can do this by again purchasing stock of the kind converted, the case must be treated as though he had, at the proper time, followed that course, and thereby put himself in a position to reap the benefits of such ownership.

The rise in market value at the time when plaintiff actually replaced the stock, or could have done so in accordance with the requirements of the above stated rule, must be assumed to represent all the advantages which would have accrued to him had the stock not been wrongfully sold, but, in addition to the principal damages thus measured, to do exact justice, he should also have compensation for delay; and, in a case like the present, this would consist of interest on the principal damage from the reacquirement-of-stock date to the date of the verdict. That the inclusion in the verdict of such interest, as compensation for delay, is but equitable is well illustrated by assuming a case where a broker wrongfully sold his customer's stock and the customer, after going through all the required preliminaries, immediately repurchased a like amount of the same stock at an advanced price, and sued the broker to recover the difference in value which he was obliged to pay. Assuming further that plaintiff's case was not tried for two or more years after the reacquirement-of-stock date, it can be plainly seen that, while plaintiff had the same advantages of his reacquired stock during this interval as he would have had had it never been wrongfully converted, yet, during the same period, he would lose the advantage of the additional capital which he was obliged to pay out to remedy the broker's wrong,—namely, the rise in the market value between the day of the conversion and the time the stock was again purchased,—and hence that he would be entitled to interest on that capital during the period in question.

The rule in New York originally was that "a plaintiff who has commenced to prosecute with reasonable dili-

gence his action for wrongful conversion of shares of corporate stock is entitled to recover the highest price it has reached between the time of conversion and the end of the trial": Romaine v. Van Allen, 26 N. Y. 309. The injustice of applying such a rule to all cases was subsequently realized (Matthews v. Coe, 49 N. Y. 57), and, in Baker v. Drake, supra, the New York Court of Appeals decided that, where stock purchased on a margin and pledged to a broker was sold by him without authority, the customer, upon being informed of the sale, if he desired to disaffirm it and require the broker to replace the stock, should thus demand, and if the latter failed or refused so to do, the customer was privileged to make the purchase himself and charge the broker with the loss sustained, i. e., the advance in the market price of the stock from the time of the sale up to a reasonable time within which to replace it under the attending circumstances. The ratiocination of this will be found in Baker v. Drake, supra, in Hall v. Paine, supra, and in the annotation and notes to the latter. See also Gruman v. Smith, 81 N. Y. 25, 28-29; Colt v. Owens, 90 N. Y. 368, 370-71; Wright v. Bank of the Metropolis, 110 N. Y. 237, 18 N. E. 79; Mullen v. Quinlan & Co., 195 N. Y. 109, 87 N. E. 1078.

It is unnecessary, for purposes of the present case, to determine how generally the New York Rule should be declared applicable in this State. The point we now decide is that the principle of that rule is applicable to the facts as they were developed at the trial under review; that is, to a case where the broker, in making the sale, acted on an honest belief that he was carrying out the instructions of his customer; for the present is not a case where the stock in controversy was sold, in disregard of the rights of the real owner, to protect interests of the broker himself or in deliberate breach of trust. The question of how far, or whether or not, the highest-price-to-date-of-trial rule should be modified in the latter class of cases, is not now before us for decision.

We shall next show that, for purposes of working out the justice of the instant case, application of the New York Rule,—in the manner we have determined it should be applied,—to the facts developed at the trial under review, will not constitute a departure from anything heretofore actually decided in Pennsylvania.

The other rule, followed at the trial of this case, that the measure of damages is the highest market value of the stock in controversy between the wrongful sale and the date of trial, appears to have been first stated by us in Bank v. Reese, 26 Pa. 143, where a bank stockholder, on an issue of new stock, demanded his proportionate number of shares, and, when refused, brought an action to recover damages. It will be observed, first, that in the Reese Case the wrongdoer apparently possessed and continued to withhold the stock from its rightful owner up to the time of trial; next, there was nothing to show that the latter could have purchased like stock in the open market prior to the time of trial at a price less than prevailed at that date. Under these circumstances we said, "The paramount rule in assessing damages is that every person unjustly deprived of his rights shall at least be fully compensated for the injury he [has] sustained"; and that, on the refusal to deliver property like bank stock, which was subject to fluctuations in value and "could not be obtained elsewhere," the market price on the day when it was wrongfully withheld would not be a proper measure of damages, adding, "Such a rule would hold out temptations to acts of wrongful conversion by making them profitable to the wrongdoer," for, "If a bank, or any other trustee, might deprive the cestui que trust of his stock without answering for the rise in the value, the beneficial owner would be deprived of the very advantage which he had in view when he made the investment." Therefore, to "reach the justice of the case," such a wrongdoer should have his wrong measured by, and be obliged to pay, the highest market value of the stock between the date of the conversion and the day of the trial.

It is quite plain that the facts in the present case are materially different from those in the Reese Case, and it will be seen that the rule there laid down has not been uniformly applied by us to all circumstances involving the wrongful withholding of stock. In Wilson v. Whitaker, 49 Pa. 114, 117, an action on a contract to recover for the failure to deliver stock sold, which, without the knowledge of the vendor, had been previously sold to another by his agent, it was held that the rule of the Reese Case did not apply. In Neiler & Warren v. Kelley, 69 Pa. 403, 408, an action of trover to recover damages for the conversion of railroad securities alleged to have been held by defendants as a pledge for the payment of debts due them by plaintiff, it was held again that the rule of the Reese Case did not govern, and that this rule applied only where "a duty or obligation devolved upon a defendant to deliver......stocks or securities at a particular time"—that, under such circumstances, "the plaintiff is entitled to recover the highest price in the market between that time and the time of trial." In Work v. Bennett, 70 Pa. 484, 489, another action of trover, where a broker who carried securities for a client wrongfully pledged them for his own debt, we held that the rule of the Reese Case did not apply because plaintiff had not put himself in a position to demand the return of the securities. In Huntington & B. T. Ry. & C. Co. v. English, 86 Pa. 247, 253, there was a failure to return loaned stock at a designated time; we held that the rule in the Reese Case did not apply, because, on the breach of the contract, "plaintiff might have gone......into the market and supplied himself" with stock of the kind in controversy and then "compelled the defendant to account for the price thereof," adding, "Moreover, that rule applies only where the parties bear to each other a trust relation." North v. Phillips, 89 Pa. 250, 254, was an action of assumpsit to recover the value of stock sold by brokers without authority from the owner. We concluded that the case involved "mere gambling" transac-

tions,—not a proper subject for judicial relief. The opinion there is important here, however, because plaintiff sought to apply the rule of the Reese Case, and we said that the rule of damages as there stated did not apply to all stock transactions, but only to those where there were breaches of trust and in "cases where justice could not be reached by [another] measure of damages." In Pennsylvania Co. v. P., G. & N. R. R. Co., 153 Pa. 160, 166, 167, where plaintiff sought to recover damages for the conversion of certain shares of defendant company's stock, on a claim that they had been wrongfully transferred on the books of the latter, it appeared at trial that, in making the transfer, the company had acted innocently, upon a forged power of attorney, and the court below refused to apply the rule in the Reese Case, because there was no "intentional violation of [a] duty as trustee." We affirmed per curiam on the opinion of the court below, which said of Bank v. Reese and the cases following the rule of damages there laid down, "These cases hold that the damages are properly measured by that rule when the conversion has been wrongful and involves a deliberate breach of trust on the part of the defendant." In Jamison's Est., 163 Pa. 143, 156, 157, an action of conversion against a pledgee-broker, we refused, on the particular facts involved, to apply the Reese-Case rule. Thus it may be seen that this court has not uniformly followed the rule contended for by plaintiff.

While the rule in Bank v. Reese has been adhered to by this court on numerous occasions, in none of these cases were the facts so nearly like those now before us as to make it a governing decision here. In Reitenbaugh v. Ludwick, 31 Pa. 131, 141, an administrator of an estate refused to account for stock of his decedent, and it was held that the party beneficially entitled might recover the highest market price up to the time of trial. In Musgrave v. Beckendorff, 53 Pa. 310, 312, we held that where one had borrowed certain securities and

wrongfully failed to return them at a specified time, the rule in the Reese Case was properly applied. In Persch v. Quiggle, 57 Pa. 247, 264, the bailee of certain stock belonging to plaintiff deliberately used it for his own purposes; this was held to be a breach of trust and a conversion which subjected the wrongdoer to the highest measure of damages. Conyngham's Est., 57 Pa. 474, 481, was an action to recover damages for the deliberate illegal use of collateral security without authority or notice from the owner. The pledged securities were used for pledgee's benefit, and at the time of trial part of them were still within the control of the defaulting pledgee. We pronounced this a palpable breach of trust which subjected the wrongdoer to the highest measure of damages. In Jennings v. Loeffler, 184 Pa. 318, 324, stock which had been loaned to defendant was not returned on the specified date. Following Musgrave v. Beckendorff, we allowed the highest market value, although it so happened that this value was reached on the very day of the demand for and refusal to return the stock in controversy. Learock v. Paxson, 208 Pa. 602, 607, 610, was an action against a firm of stock brokers, to recover damages for the wrongful conversion and sale of a customer's stock. It was conceded that no notice had been given to plaintiff that his stock was to be sold, and the sale was avowedly for the benefit of defendants, to protect their interests. We said that this was "a violation of the trust imposed upon them as pledgee"; that, "for such wrongful conversion, the measure of damages......was the highest price of the stock between the date of the conversion and that of the trial." As a matter of fact, however, a less measure of damages was actually applied, as we note at the end of the opinion in that case. Sproul v. Sloan, 241 Pa. 284, 288, was a suit by brokers against a customer for the balance of an account due by the latter. It appeared that the brokers had mingled the customer's securities with those belonging to others and pledged the whole for their own debt, without authority

from the customer. The brokers sued the customer to recover a balance due them upon the closing out of his account. A verdict was directed for defendant on the ground that plaintiffs had been guilty of a wrongful conversion and had thereby broken their contract with the customer. This point in itself was enough to sustain the judgment in the case, but in disposing of one of appellant's contentions we said that "the moment the stock was converted by the brokers to their own use, the customer was damaged, and the measure of his damages was the highest price of the stock between the date of its conversion and that of the trial," citing Learock v. Paxson, supra. In Berberich's Est., 257 Pa. 181, 264 Pa. 437, a broker, without notice, sold his customer's securities for the purpose of protecting himself as pledgee and not in any sense to serve the interests of his customer. We held the highest measure of damages applied. Thus it may be seen, as said at the beginning of this paragraph, none of the cases just reviewed necessarily rule the present one. All of them involved a deliberate wrong or breach of trust, while the record before us shows no act of bad faith or wanton misuse of plaintiff's property.

On the finding of the jury in the instant case, we must assume defendants sold plaintiff's stock without authority from or prior notice to him, at a time when he had ample funds on deposit with them to protect all his holdings, including this stock, that notice was sent to plaintiff immdiately after the sale, and that he promptly notified defendants that they had no authority from him to sell the stock; that, following this notice, there was some delay, not attributable to plaintiff, after which he was definitely told that defendants intended to stand on their position, namely, that plaintiff had in fact given them authority,—which was not later withdrawn,—to dispose of the stock in question at the price for which they had sold it; finally, that plaintiff thereafter acquired a block of 200 shares of the same stock at an ad-

.vanced price. But it must be noted that plaintiff claims, in his printed argument as appellee, that the purchase just mentioned was entirely aside from the transaction giving rise to the present suit and that for this reason neither the date of the purchase nor the price there involved should affect his recovery. Whether this claim is warranted is, however, a matter at issue.

Evidence of the above facts, and such others as are in dispute, can be considered at the next trial of this cause, where, if it is again shown and the jury finds that the sale was made by defendants, acting on an honest, though mistaken, belief that they had been so directed by plaintiff, the measure of damages will be according to the New York Rule as that rule has been stated by us in this opinion. Of course, if evidence is again presented, as at the trial now under review, that plaintiff was notified that defendants, acting on what they claimed to be authority from him, were about to dispose of his stock at the price at which they subsequently sold it, and, with this knowledge, he failed to disavow such supposed authority, the jury should be instructed, as it was at the last trial, that, should it find the facts in accord with such evidence, plaintiff would have no right to recover.

As stated in the annotation to Hall v. Paine, supra, at page 757: There is no fixed rule to guide the courts in determining what is a reasonable time for an owner of stock, held as collateral by a broker and wrongfully disposed of by the pledgee, to reacquire a like holding, other than that the time should be sufficiently long to permit the customer, under all the circumstances of the case, to go into the market and buy the stock; and the question is one of law, for the courts, not for the jury, when the facts are conceded and different inferences cannot be drawn therefrom. Where the facts are in dispute, the inferences uncertain, or the evidence of a character which must be passed upon by a jury, it is the duty of the court, in submitting the issues, to instruct the jurors as to what would be a reasonable time under the

facts as they may find them: Vilsack v. Wilson, 269 Pa. 77, 80. This is in accord with the general principle that, ordinarily, reasonableness of time is a matter of law: Jones v. Wardell, 6 W. & S. 399, 401-02; Brenzer v. Wightman, 7 W. & S. 264, 266; Leaming v. Wise, 73 Pa. 173, 176; Swan v. Watertown F. I. Co., 96 Pa. 37, 43; Miller v. Belmont P. & R. Co., 268 Pa. 51, 60.

On defendants' appeal, which we shall now consider, they contend that the whole course of dealings between plaintiff and themselves, after the sale by them of the stock in controversy and his disavowal of that transaction, including the closing out of his general account and the acceptance by him of a check for the balance thereby shown to be due him, precluded plaintiff from recovery. We agree with the court below that "The conduct of plaintiff subsequent to the sale [did not] amount to a ratification of defendants' wrong"; for, as said in Berberich's Est., 257 Pa. 181, 190, "The wrongdoer was without standing to compel [plaintiff] to make election between a ratification of his wrongful act or repudiation of it." It would be a hard rule indeed, if one, dealing with a broker who carried a long line of securities, purchased for him on margin, upon the wrongful conversion of some of these securities, were obliged promptly to close out the account, excluding the stock in question, at peril of being held to have waived or ratified its conversion. While certain of the dealings between plaintiff and defendants, subsequent to the alleged conversion, may constitute relevant evidence to shed light on issues connected with that transaction, yet, so far as shown by the record now before us, none of them is of a character to have warranted the court below in giving binding instructions for defendants.

The appeal of defendants from the refusal of the court below to grant them judgment n. o. v. cannot prevail; nor can the appeal of plaintiff from the award of a new trial. The orders are affirmed in both appeals.