**HAMILTON BANK**

v.

**EXPORT–IMPORT BANK OF the UNITED STATES and Foreign Credit Insurance Association.**

**Civ. A. No. 84–1228.**

United States District Court,
E.D. Pennsylvania.

April 28, 1986.

John Spelman, William R. Thompson, William A. Harvey, Philadelphia, Pa., for plaintiff.

J. Christopher Kohn, Daniel Loeb, Delilah Brummet, U.S. Dept. Justice, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

TROUTMAN, Senior District Judge.

This action resulted from the default by a number of Mexican companies in repayment of loans extended by the plaintiff. Hamilton Bank seeks to recoup the resulting losses from defendants Export-Import Bank of the United States (Eximbank) and the Foreign Credit Insurance Association (FCIA) pursuant to certain insurance contracts issued to plaintiff allegedly insuring it against the losses suffered from the defaults.

An understanding of this action requires an understanding of the relationship between the two defendants. Congress created Eximbank in 1945 to serve as, *inter alia*, a medium for encouraging American lending institutions to extend credit to foreign entities which, in turn, would be required to use the loans to purchase goods manufactured in the United States. As an incentive to commercial lenders to extend such credit, Eximbank, pursuant to its statutory authority, organized the FCIA, an association of the nation's leading commercial insurers, to facilitate a supply to meet the demand for insurance against the risk of foreign debtors defaulting on loans extended pursuant to this scheme. Eximbank's authorizing statute, 12 U.S.C. § 635, *et seq.*, provides that the Bank itself may issue such insurance or may utilize insurance companies or groups of insurance companies, *i.e.*, FCIA, as its agent in the issuance of such insurance and the processing of claims. 12 U.S.C. § 635(c)(2).

FCIA presently serves as Eximbank's "exclusive agent" in this area. As such, FCIA serves two functions. First, regarding certain "commercial credit risks", FCIA serves as the agent of the participating insurance companies in the issuance and

servicing of export credit insurance. Here, FCIA and its member companies serve as the sole insurers against such losses. Second, regarding "Political Risks" and "certain commercial credit risks", FCIA serves as the exclusive agent of Eximbank, which itself serves as the insurer against such losses. (Defendants' Motion for Summary Judgment, Charamella affidavit, Ex. A— "Agency Agreement Between Eximbank and FCIA"; Ex. B–1—"Short Term-Comprehensive Export Credit Insurance Policy; and Ex. B–2—"Master Export Credit Insurance Policy"). *See also, Lovell v. Export-Import Bank of the United States, et al.,* 777 F.2d 894 (3d Cir.1985).

Hamilton Bank, as part of this scenario, advanced loans to a number of Mexican companies which, as stated earlier, defaulted in the repayment of the loans when the Mexican government prohibited Mexican nationals from repaying such debts in United States dollars.[1] Following the defaults, the plaintiff presented to FCIA, pursuant to certain policies for export credit insurance it had purchased from the defendants, notices of claims and proofs of losses, seeking recovery of the unpaid balances on the defaulted loans. Since the losses resulted from an occurrence within the political risk provisions of the policies, Eximbank serves as the actual insurer of any covered losses.

(Charamella Affidavit, Ex. B–1, Coverage B, and Ex. B–2, Coverage B).[2]

Eximbank, through FCIA, initially paid one of the claims; however, it subsequently denied that Hamilton Bank had suffered any covered losses regarding any of the sixteen (16) claims involved. The defendants denied the plaintiff's claims for the reason that the bills of lading and airway bills presented by Hamilton Bank as proof of shipment were fraudulent. It is undisputed that the bills of lading and airway bills were fraudulent. It is also undisputed that Hamilton Bank had no knowledge that the bills were fraudulent. It presented the documents to FCIA in complete good faith.

The plaintiff states three (3) causes of action against the defendants. Count I states a cause of action for breach of contract. Count II states a cause of action for intentional misrepresentation. Count III appears to state a cause of action for "bad faith denial" or, in the alternative, is an extension of the plaintiff's claim stated in Count II to include a demand for punitive damages. The defendants have filed no answer to the plaintiff's complaint and discovery has yet to be taken. The action comes before us for consideration of the defendants' motion for summary judgment.[3]

---

1. Hamilton Bank's action is based upon defaults on sixteen (16) different loans. The dates of the loans, the amount of the losses, and the borrowers are as follows:

| | Date | Amount of Loss | Borrower |
|---|---|---|---|
| 1. | 12/11/81 | $ 97,404.70 | Carbu Parts |
| 2. | 12/11/81 | $ 98,262.00 | Technics Electromedicos |
| 3. | 1/4/82 | $ 98,598.00 | Grupo Ellamsa |
| 4. | 1/4/82 | $ 98,393.76 | Herfe, S.A.Constructora |
| 5. | 1/8/82 | $ 51,000.00 | Products Solex |
| 6. | 1/14/82 | $102,807.60 | FOCOINSA |
| 7. | 1/14/82 | $102,344.00 | Chrysos, S.A. |
| 8. | 1/18/82 | $ 98,600.00 | Alpha Electronics |
| 9. | 2/2/82 | $101,195.00 | Productos Solex |
| 10. | 2/4/82 | $102,865.00 | Carbu Parts |
| 11. | 3/24/82 | $100,772.90 | Herfe, S.A.Constructora |
| 12. | 3/31/82 | $ 47,680.00 | Productos Solex |
| 13. | 4/19/82 | $ 96,840.00 | Chrysos, S.A. |
| 14. | 4/22/82 | $100,087.50 | Grupo Ellamsa |
| 15. | 6/2/82 | $ 96,690.00 | POCOINSA |
| 16. | 6/17/82 | $ 99,308.00 | I.D.E.A.H. |

2. While the plaintiff no where in its memoranda submitted to this Court raised the issue of whether its losses were covered as a political risk or a commercial risk, assuming it suffered an insured loss, plaintiff's counsel at a conference before this Court did raise this question. We find and conclude, however, that, assuming the plaintiff suffered an insured loss, the loss clearly comes within the political risk provisions of the applicable insurance contracts, and thus, Eximbank is the actual insurer of any such losses.

3. The defendants' motion for summary judgment was accompanied by a motion to stay discovery and enlarge the time in which they would be required to file an answer. The latter motion was referred to a Magistrate for disposition. The Magistrate, on June 6, 1984, ordered that discovery in this matter be stayed and that the defendants need file no answer to the plaintiff's complaint pending this Court's decision on the summary judgment motion. Plaintiff did not appeal the order of the Magistrate.

The defendants argue that judgment should be entered in their favor and against the plaintiff for three reasons. They are: (1) that under the terms of the insurance contracts involved the plaintiff did not suffer an insured loss; (2) that plaintiff's action on claims 1 through 10, as delineated in fn.1, *supra,* are time-barred based upon the limitation of suit clause contained in the contracts and correspondence covering said ten (10) claims and (3) that the defendants are immune from suit under the doctrine of sovereign and/or official immunity for any misrepresentations or bad faith denials.

### A. *The insurance contracts.*

The defendants issued two types of insurance policies to Hamilton Bank. Claims 1 through 12 are controlled by the provisions of the "Short Term-Comprehensive Export Credit Insurance Policy", (Charamella affidavit, Ex. B–1). Claims 13 through 16 are controlled by the provisions of the "Master Export Credit Insurance Policy", (Charamella affidavit, Ex. B–2). Both policies contain similar, if not identical, language regarding "insured" risks. The Short Term policy under Coverage B—Political Risks provides, "Eximbank will indemnify the insured ... in connection with *eligible shipments ...*" (Emphasis added). "Eligible shipments" are defined as:

> ... all shipments of products stated in the application made a part hereof which products are: 1. *shipped from the United States during the policy period specified in the declarations;* and ... 5. *shipped to buyers in the countries listed on the Countries Limitation Schedule ...* (Emphasis added).

(Charamella affidavit, Ex. B–1). The Short Term policy further provides that, "An *eligible shipment* begins when the products in question are shipped en route to the buyer on the order of the insured or any of its agents". *Id.* Regarding presentment of the proof of loss, the Short Term policy provides Eximbank "will make payment within three months after the submission by the Insured of the best evidence reason-

ably available to it" that a loss covered by the political risk provisions of the policy has occurred.

The Master policy provides that under Coverage B—Political Risks, "The Insurer will indemnify the Insured ... with respect to the *financed portion* of an *insured transaction ...*" (Emphasis added). (Charamella affidavit, Ex. B–2). "Insured transaction" is defined as:

> ... a sale or sales approved by the Insurer on the conditions specified in the declarations, provided the products sold are: 1. *shipped from the United States during the policy period specified in the declarations, such shipment to begin when the products in question are placed en route to the buyer ...* and ... 5. *shipped to buyers in the countries listed in the Country Limitation Schedule ...* (Emphasis added).

*Id.* Regarding presentment of proof of loss, the Master policy provides Eximbank will make payment "within three months after submission of the best evidence reasonably available to the Insured" that a political risk loss has occurred.

The defendants contend that they are entitled to judgment as a matter of law on claims 1 through 12 under the Short Term policy because no shipments of goods ever occurred and, therefore, there are no "eligible shipments" for which coverage can exist. In response, the plaintiff argues that the defendants' interpretation of the policy as requiring an actual shipment of goods is contrary to the express language of the contract or, in the alternative, that the terms of the policy are ambiguous, thereby requiring reformation of the contract in favor of the plaintiff pursuant to the principle that a contract should be construed most strongly against the drafter. Identical arguments are advanced as to whether an actual shipment of goods is required to establish an "insured transaction" under the terms of the Master policy applicable to claims 12 through 16.

 We agree with the plaintiff that a genuine issue as to a material fact exists which precludes us from entering summary

judgment as to this issue, *i.e.*, whether the plaintiff sustained an insured loss. We disagree that such an issue of fact is created by any ambiguities in either the Short Term or Master policies. We find both policies are clear, unambiguous and subject to only one interpretation, *i.e.*, that there must be an actual shipment of goods before Hamilton Bank may claim it has sustained an insured loss. We are unpersuaded by the plaintiff's argument that its good faith production of the bills of lading and airway bills referred to earlier constituted a waiver of the policies' requirement that there be an actual shipment of goods or somehow estops Eximbank from denying coverage on the grounds that this requirement has not been fulfilled. The policies' provisions regarding production of proof of loss merely establish a methodology for an insured to assert a claim and a time frame in which Eximbank, through its agent FCIA, must respond. The simple production in good faith of such documentation did not, by the very fact it was produced, create insured transactions. *See Fleet National Bank v. Export-Import Bank of the United States, et al.*, 612 F.Supp. 859 (D.C. D.C.1985) (reading of contract as requiring actual shipment of goods "has considerable appeal".)

■ We are also unpersuaded by the plaintiff's argument that the defendants' construction of the policies vitiates the purpose underlying the policy and the very reason for Eximbank's existence. While it may be true that the denial of coverage for such claims may hinder the plaintiff and other lending institutions from extending such credit in the future, such a consequence does not require nor does it allow us to reform the terms of the insurance policies involved. It is the obligation of Eximbank, not this Court, to determine how to best facilitate the export of Ameri-

can goods under its statutory authority, and we will not, nor can we, second guess Eximbank's decision as to how to exercise its authority.

■ Although we find the insurance contracts are clear and unambiguous, we are precluded from entering summary judgment in the defendants' favor on this issue because the record before us discloses a material issue of fact as to whether the goods and merchandise were "shipped". While Mr. Joseph M. Piepul, Senior Counsel for the FCIA, states in his affidavit that FCIA's "claim investigation revealed that no actual shipment of goods had taken place", documentation presented by Hamilton Bank indicates such shipments, at least in part, may have indeed occurred. (Plaintiff's memorandum in opposition to defendants' motion, Ex. A—"Telex from Joseph Piepul to Ms. Sheila Harris", and Ex. 1—affidavit of Sheila Harris). Thus, we believe the plaintiff must be given the opportunity to prove such shipments did occur. *See Fleet National Bank v. Export-Import Bank, supra.*

### B. *Waiver & Estoppel.*

The defendants next argue that Hamilton Bank's action on claims 1 through 10 is time barred based upon the limitation of suit clause contained in the Short Term policy applicable to said claims. The policy provides in Article IX that, "No action shall lie against the Insurers or any of them with respect to any loss unless ... commenced prior to the expiration of eighteen months from the *due date* of the indebtedness". (Emphasis added). It is undisputed that, absent any tolling of the limitation of suit clause, the plaintiff's action on claims 1 through 10 was commenced after the eighteen-month period had run.[4] Hamilton Bank, however, argues that the defendants

---

**4.** The respective due dates and commencement of action dates are as follows:

| Claim No. | Due Date | Last Date to File Action |
|---|---|---|
| 1. | 6/1/82 | 12/1/83 |
| 2. | 6/7/82 | 12/7/83 |
| 3. | 6/28/82 | 12/28/83 |
| 4. | 6/28/82 | 12/28/83 |
| 5. | 7/5/82 | 1/5/84 |
| 6. | 7/6/82 | 1/6/84 |
| 7. | 7/12/82 | 1/12/84 |
| 8. | 7/10/82 | 1/10/84 |
| 9. | 7/28/82 | 1/28/84 |
| 10. | 8/2/82 | 2/2/84 |

by their conduct tolled the running of the limitation of suit clause.

■ Specifically, the plaintiff refers this Court to a letter from Joseph Piepul addressed to, *inter alia*, Ms. Sheila Harris, in which he states:

> With respect to the handling of FCIA claims, you and your principals are granted extensions until January 1, 1984 of all filing deadlines or filing requirements for claims or information under your respective ... Policies".

(Plaintiff's memorandum in opposition to defendants' motion, Ex. B). The plaintiff argues that based upon this letter the defendants are now estopped from relying upon the deadlines created by Article IX because their conduct tolled the provision for one hundred thirty-four (134) days, *i.e.*, the period from the date of the letter to January 1, 1984.

■ There is no doubt that an insurer may waive such a provision or by its conduct become estopped from asserting the limitation. Such is not the case here however. Even assuming the phrase "all filing deadlines or filing requirements" may be interpreted as encompassing the provisions regarding filing of suit, the letter expressly limited the extension to January 1, 1984, and no inference may reasonably be drawn from the document that all deadlines were concomitantly extended for a period of one hundred thirty-four (134) days past January 1, 1984. We also question whether traditional principles of waiver and estoppel, *i.e.*, Pennsylvania law, apply here since the actual insurer in this instance is an agency of the United States Government. As stated by the Third Circuit Court of Appeals in *Lovell v. Export-Import Bank, et al., supra,* "courts have been reluctant to apply estoppel against the government ... based upon considerations of sovereign immunity, separation of powers, and public policy". 777 F.2d at 898. Thus, some form of "affirmative misconduct" on the government's part is required before estoppel may be invoked against it. The record before

us discloses no such affirmative misconduct nor has the plaintiff adduced any issue of fact as to this question. *Id.* at 899. However, whether we apply traditional principles of estoppel or the higher standards applicable when estoppel is asserted against the government, we reach the same result, *i.e.*, that the defendants did not waive the provisions of Article IX nor did they by their conduct become estopped from asserting the limitation.

Hamilton Bank further argues that the defendants may not rely upon the limitation of suit clause absent a showing that they were somehow prejudiced by the plaintiff's failure to file suit within the prescribed deadline. *See ACF Products, Inc., v. Chubb/Pacific Indemnity Group,* 451 F.Supp. 1095 (E.D.Pa.1978). Such clauses were completely acceptable and enforceable at common law without any demonstration of prejudice. However, the developments in the law pertaining to contracts of adhesion has raised serious doubts as to the efficacy of such provisions. *See Brakeman v. Potomac Insurance Co.,* 472 Pa. 66, 371 A.2d 193 (1977) (insurer must demonstrate prejudice flowing from insured's failure to comply with a notice of loss provision) and *Diamon v. Penn Mutual Fire Insurance Co.,* 247 Pa. Super. 534, 372 A.2d 1218 (1977) (plurality opinion) (insurer effectively tolled running of limitation of suit clause by instigating institution of criminal charges against insured). The Pennsylvania Supreme Court has not as yet ruled whether an insurer is required to demonstrate such prejudice where the limitation of suit clause is not required by statute to be included in the policy. *See Esbrandt v. Provident Life and Accident Insurance Company,* 559 F.Supp. 23 (E.D.Pa.1983), *aff'd. mem.,* 722 F.2d 731 (insurer need not demonstrate prejudice from violation of limitation of suit clause in group life insurance policy where provision required by Pennsylvania statute) and *Petraglia v. American Motorists Insurance Co.,* 284 Pa.Super. 1, 424 A.2d 1360 (1981) (insurer need not demonstrate

The plaintiff did not commence its action until March 13, 1984.

prejudice from violation of limitation of suit clause where provision required by statute). The federal district court in *ACF Produce, supra,* held that under Pennsylvania law an "insurer may (not) avail itself of the limitation of suit clause absent a showing of prejudice". 451 F.Supp. at 1098. The court's ruling, however, has been questioned by at least two other courts. The Third Circuit Court of Appeals in *Leone v. Aetna Casualty & Surety Company,* 599 F.2d 566, 569, fn. 4 (3d Cir.1979), stated it was not as sure as the court in *ACF Produce* that "*Diamon* meant to apply *Brakeman* . . . to the type of contractual clause at issue there," *i.e.,* a limitation of suit clause. The Pennsylvania Superior Court raised the same question in *Petraglia, supra. See also, Pini v. Allstate Insurance Company,* 499 F.Supp. 1003, 1005, fn. 4 (E.D.Pa.1980).

▮▮▮ While the above discussion demonstrates the unsettled nature of the law in Pennsylvania in this area, we conclude that an insurer need not demonstrate prejudice in order to rely upon a limitation of suit clause even where the provision is not required by statute to be included in the policy. We reach this conclusion based upon established precedent and the failure of the Pennsylvania Supreme Court to overrule that precedent. Further, as stated earlier, we also question the applicability of Pennsylvania law to this action, *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), and applying general principles of the common law of contracts, such a showing of prejudice is not necessary.[5] *See also, Fleet National Bank v. Export-Import Bank, supra.*

C. *Sovereign Immunity.*

The defendants' final argument is that they are immune from suit on Counts II and III of the plaintiff's Complaint under the doctrine of sovereign and/or official immunity. Eximbank argues it is immune from suit as an agency of the United States. See 12 U.S.C. § 635. FCIA argues it is entitled to official immunity as the agent of Eximbank.

▮▮▮ We agree with the defendants that the plaintiff's exclusive tort remedy against Eximbank is the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671–80, and find the plaintiff's reliance upon the "sue and be sued" clause in Eximbank's authorizing statute to be misplaced. The FTCA explicitly provides that:

> The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) of this title, and the remedy provided by this title in such case shall be exclusive.

28 U.S.C. § 2679(a). *See Taylor v. Administrator of the Small Business Administration,* 722 F.2d 105 (5th Cir.1983); *Northridge Bank v. Community Eye Care, Inc.,* 655 F.2d 832 (7th Cir.1981); *Peak v. Small Business Administration,* 660 F.2d 375 (8th Cir.1981); and *Federal Deposit Insurance Corporation v. Citizens Bank & Trust Company,* 592 F.2d 364 (7th Cir. 1979). Thus, the "sue and be sued" provision of 12 U.S.C. § 635(a)(1) does not constitute a waiver of the government's sovereign immunity separate and apart from the provisions of the FTCA.

▮▮▮ We similarly reject the plaintiff's argument that its claims against Eximbank for misrepresentation and "bad faith denial" are not cognizable under 28 U.S.C. § 1346(b), which provides:

> . . . the district court shall have exclusive jurisdiction of civil actions on claims against the United States . . . for injury or loss of property . . . caused by the

---

**5.** We are unpersuaded by the plaintiff's argument that its lack of discovery prevents it from properly asserting its defenses of waiver and estoppel. The very nature of these principles requires that the evidence supporting such claims be within the plaintiff's possession. One cannot rely upon that of which he has no knowledge. Therefore, discovery could adduce nothing more to support Hamilton Bank's argument than it already has or could have presented.

*negligent or wrongful act or omission* of any employee of the Government.

28 U.S.C. § 1346(b). (Emphasis added). Whether the plaintiff's claims in Counts II and III be construed as actions for negligent or intentional misrepresentation or bad faith denial, they fall within the ambit of the negligent or wrongful conduct language of § 1346(b) and, therefore, are within the scope of the FTCA. Based on this conclusion, we look to the FTCA to determine whether Eximbank's immunity from suit for torts has in any way been waived. We find that Eximbank's immunity has not been waived for claims of misrepresentation and bad faith denial based upon 28 U.S.C. § 2680(h), which provides that the Act excludes from its general waiver of immunity "Any claim arising out of ... misrepresentation (or) deceit". *Id.* Thus, we shall enter judgment in favor of defendant Eximbank and against the plaintiff on Counts II and III of the plaintiff's complaint.

██ The final question we must resolve is whether the FCIA is similarly immune from suit for any torts it may have committed while acting as Eximbank's agent in this area. Our examination of the case law in this area reveals some confusion as to the theory of immunity of which a fiscal intermediary such as FCIA may avail itself. For example, the Eighth Circuit Court of Appeals in *Rochester Methodist Hospital v. Travelers Insurance Co.,* 728 F.2d 1006 (8th Cir.1984), stated that "Travelers argue(d) that Rochester's suit against it (was) barred by *sovereign immunity* because the suit is, in fact, one against the United States". (Emphasis added). *Id.* at 1012. The Eighth Circuit rejected Traveler's argument, and held that it was not immune from suit under the doctrine of sovereign immunity. The district Court in *Community Health Services of Crawford County, Inc. v. The Travelers Insurance Company,* Civil Action 78–74, slip op. (W.D.Pa. December 29, 1980), *rev'd. on other grounds,* 698 F.2d 615 (3d Cir.1983), *rev'd.,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), on appeal from mandate of Third Circuit, *cert. denied,* —— U.S. ——, 106

S.Ct. 795, 88 L.Ed.2d 772, *reh. denied,* —— U.S. ——, 106 S.Ct. 1289, 89 L.Ed.2d 596, accepted Travelers' argument that it was immune from suit. The district court based its holding upon the doctrine of official immunity as opposed to sovereign immunity. *Id.* at 10, citing *Butz v. Economy,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), and *Matranga v. Travelers Insurance Company,* 563 F.2d 677 (5th Cir. 1977). Here, FCIA has only argued that it is immune from suit pursuant to the doctrine of official immunity and, therefore, we need only consider the issues raised by its contention that it is so immune.

It is clear that in this case the plaintiff is alleging that the FCIA committed a tort. FCIA, for purposes of this motion only, does not dispute this allegation, but rather, asserts that even if it did commit a tort, it was acting within the scope of its official authority as Eximbank's agent and, therefore, it should be held immune from suit for any tortious conduct on its part. *See Rochester Methodist Hospital v. Travelers Insurance Company, supra.* In this regard, we find merit in the plaintiff's argument that it has been prejudiced by its inability to proceed with discovery in this matter. The plaintiff has effectively been precluded from investigating whether the FCIA was truly acting within the scope of its authority with regard to the marketing of the insurance involved. Thus, the plaintiff has been effectively precluded from properly responding to FCIA's argument that it is immune from suit. Therefore, we will reserve decision on this issue in order to allow the plaintiff to conduct discovery into this area.

██ Finally, the plaintiff's claim in Count III for "bad faith denial", if it be such, presents us with a unique situation, *i.e.,* that FCIA could be held liable for bad faith denial of a claim under an insurance contract on which it was not the actual insurer but merely the agent which sold the policy. The plaintiff, in fact, passes no such cause of action against FCIA for FCIA in this instance only acted as the

broker for Eximbank and was, therefore, as just stated, not the actual insurer of the loss suffered by the plaintiff. (*See* fn. 2, *supra* ). Thus, we will grant the motion for summary judgment of FCIA as to Count III of the plaintiff's complaint.